I would like to reserve 2 minutes for rebuttal. Essentially, the question that the court is here to answer today is not whether errors occurred in his trial, but whether the errors are reversible. Do you think the government agrees with that? I think that the government would have to agree based on what occurred in the trial, and I think they agreed in their briefs that certain errors did in fact occur. So the – what the court has to decide is whether the errors were plain, because no objections were made at trial. So the court has to determine whether – By errors, are you referring to the questioning regarding – opening statement and questioning regarding the truthfulness element of the agreement and the questioning regarding whether the defendant thought that the government's witnesses were being untruthful? That in addition to the vouching and the bolstering that occurred with Jose Camposano, the informant that – or not the informant, but the co-conspirator that testified, I think those errors were also – What – what vouching other than the truthfulness element? Well, other than the truthfulness element was when they started to refer to the case in New York where the prosecutor said, you and I, we've talked, we've met about this other case, the first time you met with the DEA agents. You provided them information, didn't you? In fact, you named names. So he brings in a whole aura of an interview that occurred outside of the presence of the jury, information that was not presented to the jury, and essentially endorses Mr. Camposano's testimony by saying, you know, we've got other information that we were able to verify. What was the defense in this case? The defense was essentially a duress defense. What Fernando Cornel Reyes was claiming was he had no knowledge before coming to Las Vegas. He had driven the car there, but he had no knowledge that there was going to be a drug transaction that involved the vehicle. And it wasn't until he got up to the room with Mr. Camposano that he learned there was going to be a drug transaction. His testimony was then he tried to leave. Mr. Camposano tripped him and said, essentially, I have someone stationed outside your daughter's house in the Dominican Republic. If you don't go through with what I need you to go through with,  And so his testimony was he was scared. And he went through with what Mr. Camposano wanted, which was essentially to sit down and say he was the driver that was going to take the drugs back, he was a drug dealer, he knew what was going on, and kind of inflate the drug deal so that it would go through. Wasn't there testimony that your client had bragged about doing this before? The only testimony about Mr. Cornel Reyes doing anything before came from Mr. Camposano, who was testifying. It came from the drug agent who said that during their conversation, your client was selling the deal by saying how he had been involved in all of this before and how he had done all these prior drug deals. That is correct. But what Mr. The answer is that that was part of the script. That was part of the script, exactly. That's essentially what his defense was at trial, is that Mr. Camposano told him what to say and said we need to come off essentially as big drug dealers. Here's some of the things you're going to tell him, that you did deals in the past, that we've worked together in the past, et cetera. So there was nothing extraneous from that one conversation, which Mr. Cornel Reyes says was done under duress. The only other information that came out at trial was the fact that he had been stopped in Kansas City in a car that was discovered to have money in it. Besides that, there's no taped conversations. He's never speaking with any of the other co-conspirators. He's not present when any of the other conversations or transactions are done, except for the one with the detective after he claims his daughter's life was threatened. What's your best case or cases for getting from error to plain reversible error? I think that, for instance, the Rudberg case where we had the information about the Rule 35 and the truthfulness provisions and those kind of things that occurred in that case. It was a little bit more laid out in that case, but I think the error is the same, where they said you can't put that kind of information in front of a jury, and if you do, we're going to assume it was prejudicial. I think the problem with that was that there was an objection. There was an objection in that case, so that is a difference. But I think the best non-objected plain error, reversible error cases. You know, I honestly didn't lay them out in my paperwork here. I know that I had some in my brief that were listed, and I know that the Nochia case goes through a summary of different cases that go back and forth. Nochia came out the other way. Nochia came out the other way, but I think the difference in the Nochia case was one that the vouching was not as blatant. And in addition, in Nochia, you had a cautionary instruction that said this individual is testifying under agreement. Be careful what he says. Was there no cautionary instruction in this case? There was nothing that had to do with the agreement, the fact that he was testifying under agreement. It was essentially. Were you told to be very cautious about the testimony of cooperating individuals? Wasn't there? They were told, I believe, one, that he had prior felonies and be cautious, and two, that he was a co-conspirator, to be cautious. But nothing about. You don't think that's a limiting instruction? I think it's a limiting instruction, but I think in Nochia and some of the others, there was a specific instruction saying be careful because of this agreement. And that is one difference that I think makes a difference to a jury. That's another thing to point out to them, that you need to be careful what this individual is saying. In a plain error review, don't we have to find a fairly grave miscarriage of justice risk or something like that? Just this pedophoguing by the prosecutor, unfortunately, does happen sometimes, but it doesn't always rise to the level of the miscarriage of justice. What was the harm in this alleged getting this witness to comment on the veracity of the witness for the government? I think why it is reversible in this case is the whole case was a credibility contest. The jury had to believe either Mr. Campesano, the three-time convicted felon testifying under the plea agreement, or Mr. Reyes, who had no prior criminal history and put on a defense of duress that was plausible and fit in all of the other facts that the government had. There was no independent circumstantial or other evidence other than the testimony of those two people. So when you have a credibility contest in front of a jury and you allow the prosecutor to put their thumb on the scales and essentially give a stamp of approval to their witness by vouching for him, that's a problem. That's your other point. When I'm talking about this credibility problem, it's astonishing that the jury would believe Campesano, but they did, apparently. Exactly. And I think part of the reason they did is because they had this other information and the prosecutor was giving him some sort of an endorsement. But then on the other side, what you're asking is, when you put a defendant on the stand and you, first off, before he gets on the stand, you have an agent saying, I thought he was untruthful, I don't think he was telling the truth, I just quit talking to him. That was damaging to his credibility before the first word came out of his mouth. And then once he gets on the stand, you have him being placed in a situation where he's being forced to call all the other witnesses liars. He's being forced to call Mr. Campesano a liar, which perhaps wouldn't be the most egregious error. But then you have him making, calling the detective, both Detectives Guerrera and the other Detective Murray. There's a general question, aren't there? I don't think he lied. He did a good job in answering those questions. He said that the, you know, that the big dealer, Campesano, lied, but that the government agents either were mistaken or somehow, you know, were wrong due to wrong impressions. He didn't say they were liars. But the law seems to be that it's, it is a violation to, or it's an error to put the witness in the position where he's even asked regardless of his answer. I'm not sure I understand why, but you're, I think you're correct that it is error. How harmful it is to, I mean, it's obvious somebody's got to be mistaken if the story is directly conflict. And so to ask him if the story is, if they're mistaken in their testimony doesn't really seem to be such an egregious offense, although it, under our law, it appears to be error. Your Honor, it definitely under the law appears to be error. And I think you're right that the answer to the question is not the deciding factor. The fact is placing him in that position and putting him in a position where he either has to say, yes, they are liars, or he has to say, I could have been wrong, and thereby hurting his own credibility. No, they're not liars. They're just mistaken, which is what he said, which I thought it was a good answer. Well, it may have been a good answer, but he should never have been asked the question, I guess, is where my point is. And I'll reserve the remaining time for rebuttal. Good morning. My name is Russell Marsh, and I'm an assistant U.S. attorney in Las Vegas. I represent the government. To answer Judge Reinhart's first question, yes, there were errors. There were a couple of them, and they were very minor. I think you just talked about the questions that were asked of the defendant, which were admittedly improper. But the way that he dealt with those did not, by not answering the questions and sort of wiggling around, resulted in a situation where he was not forced to call these other witnesses a liar. The error is the asking of the question regardless of the answer. Absolutely. But it's mitigated by the nonresponsive answer. Do you agree with counsel that this is a pure credibility case? No, this is not a. Why isn't it just simply a question of whether you believe Camposino or you believe the defendant? I would argue that Camposino's testimony was not even necessary in this case, that there was substantial independent evidence of guilt. You have a defendant who stopped the week before with a car full of $46,000 worth of cash in western Kansas. And he says, I have no idea that it's there. And then after that, there are conversations between the undercover detective and Maria Gomez, a totally third party whose statements are in as co-conspirator statements, renegotiating the deal. And so they end up posting various vehicles as collateral so that they can go afterwards, sell the drugs, and then they'll get their car back, cars back. There's no question that the car was part of the deal that he was driving. Absolutely. Now, the question is whether he knows that he's involved in a drug transaction. Well, you know, this isn't much unlike cases down on the Arizona border. In San Diego, you stop somebody that has 20 pounds of cocaine in a hidden compartment and he says, I had no idea that it was there. You might give him the benefit of the doubt. But if you found out that a week before he was caught in another car that also had 20 pounds of cocaine in it, I would think that very few jurors are going to give that person the benefit of the doubt. You might convict him of transporting money illegally or something. Right. Do you think you can convict him of a drug offense because he's carrying money in a car? Well, in this case, what he was going to do and what he admitted to the detective, not Camposano, he admitted to the detective while he's sitting in the bar at the Mirage, was I'm going to be the one who's going to drive these drugs back to New York. Right. And his explanation is this is what Camposano forced him to say. Right. That's his story, is that he gets the ---- It may not be terribly believable, but it's his story that that's what Camposano forced him to say, and Camposano says that's not true. Right. It comes down to which one you believe, doesn't it? Well, it also comes down to which one you believe in the context of all this other evidence in the case involving the fact that he'd been caught the week before. It is him. I'm sorry. No, you finish your answer. And also, you have the detective, Detective Guerra's testimony, which he also tries to say he's lying too. And remember, he said that both of those witnesses were lying during his direct. He says that everything that Camposano said was all lies. This is before he's even asked on cross he's opened up this whole issue. But anyways, to get back to Detective Guerra, he says I'm sitting in the bar at the Mirage. This guy's happy. It's just a night out in Vegas. You know, we're jovial. He's bragging about doing prior drug deals. And the defendant also has to put his credibility on the line against that witness too because he's saying, oh, I was upset. I had been sitting in my hotel room rehearsing this for four hours. Any idiot could have told you that I was upset. So to that extent, the detective's lying too. So it's not just a credibility duel between those two. It also involves the detective. And it also involves this unimpeachable fact of this money being found the week before and the fact that he goes ahead with another transaction a week later and was entrusted with both that money and the valuable Mercedes that he drove across the country as collateral. And the prosecution, you know, could have stood up and not done any cross of the defendant at all. I'm not going to say that's ever going to happen, but given that he had already brought out in his direct that he was calling these people liars, it wasn't to any surprise that he was going to ask those admittedly improper questions. Now, the other error. Can I ask my question now? Sure. Or do you have more? More errors? No, no. Do you have more? You were, I think, answering or making a comment. I didn't want to interrupt you. Are you finished? No. Go ahead, Your Honor. Okay. Here's my question. It's clearly improper to ask one witness to comment on the credibility of another, isn't it? Because it usurps the function of the jury. They're the ones who are supposed to judge credibility. They won.   And if you were to tell me our one of training new prosecutors, it would be on or at the top of the list of no-no's. This is something you do not do. Right? I would say yes to that. And I would say, you know, our judge can't do that. I'm asking a witness, bolstering a witness's credibility by asking about a plea agreement. What happens if you don't tell the truth? I go to jail. That's not proper either, is it? Well, it's proper if the defendant brings it up during their opening, as they did here. Just standing alone, neither of these things are proper, right? In this circuit, the second point. And absolutely, I will say this. You know, our district was hot to task. Here's my follow-up. Here's my ultimate question. Sure. How do we stop you guys from doing this? I think you already have. Last summer's decision in Weatherspoon was a wake-up call to our district. If you read Judge Trott's concurrence in the revised opinion, he notes our U.S. attorney basically stepped up and said, we have problems in our office with young prosecutors who are doing things they shouldn't, particularly in the Ninth Circuit. And we've had training on vouching. We've had training particularly on the use of plea agreements to explain to people that you can't just front those during the direct examination, that you have to wait for it to be brought up. So we understand that. It's not like we need another case to be taught a lesson here. We appointed an appellate chief to look at these briefs so that we're not making arguments that everything that we do is invited error, as was done in that case. I'm not standing here and saying that, you know, that this is invited error. The prosecution is held to a higher standard. We understand that. What I would argue here is that it didn't affect the outcome of the trial, that there was so much other evidence that even if you set aside all of Capitano's testimony, that there still would be a conviction in this case. So it's not plain error. I'd like to talk just for a second about the vouching argument, if I could. What I would admit was error there was not the use of the plea agreement during the direct examination. It's an issue that we brought up for the first time in our response, which is the use of talking about the plea agreement during the opening. And in that situation, this case is exactly like the Nicholasia, however you pronounce that case, where exactly the same thing happened, where the prosecution brought up the plea agreement during the opening, then the defense beat on the cooperation in their opening, and then it came out during the direct examination. Here, the defendant's whole opening statement is all about Camposano's credibility. He says that he played let's make a deal. Then he talks about it again in closing. It's the first thing out of his mouth. He says lies, lies, lies. This case is all about the lies of Camposano. He's trying to make it into a credibility. Well, it was. It had to be a credibility case. Well, from the defense's perspective, exactly. He has to say that. It's him against everybody. You know, he has to say it was to us. He doesn't deny that he said the things to the drug agent that the drug agent says. There's a disagreement about what his facial manner was or whether he seemed nervous. Right. But there's no disagreement about what he said to the drug agent. The only disagreement is whether you believe his story, that he was surprised to learn it was a drug deal, and then there was this threat about his daughter, and he wasn't going to drive the drugs, but he told the agent he was because he was under duress. Right. That's their whole defense. Yes, it is. And that whole defense depends on his story that Camposano forced him to do all this, and Camposano says that's a lot of nonsense. I still think that the prosecutor could argue that this whole thing was a – that his story was a bunch of self-serving nonsense without doubt. You can't justify Camposano and say believe Camposano because he's got this plea agreement and he's promised to tell you the truth, and our whole office is going to meet to decide whether he told the truth and whether he should get a plea deal and whether we should recommend something. I don't think that they admitted – well, the headline of questioning was like that. I think that it was basically – I read it that it's almost like a plea colloquy where he's saying I met with you, I explained to you what this deal meant, you understand that you have to tell the truth, but you understand that it's up to us to recommend whether or not you're going to get some – that's all he says. That's not vouching, particularly when the whole case is going to be about Camposano's testimony. We know that from the beginning. I assume it's up to me personally. It's up to the whole U.S. Attorney's Office, correct? Yeah. I mean, that really is kind of surprising. I thought that – One thing the Court should know – Five or six pages of questioning. What the plea agreement requires of him in the way of truthfulness. It's not just a question, you're bound to tell the truth. It's, I think, six pages of interrogation on what that truthfulness agreement really means to him. Two points to keep in mind there. One is that the agreement was already in evidence, it was going to be in evidence without any objection, and that's allowed under the Halbert case, once it's brought up during opening. And the other is, even if there was some vouching there, it's hard to see given the Nekochia case that says that you're allowed to talk about that during the direct, that it could be plain error for a prosecutor to do it. Are we going to, in a plain error case, draw some line between how far he can go and how far he can't go, particularly when everybody knows this case is going to be about, at least from the defendant's perspective, Camposano's credibility? Well, if the case is entirely about credibility, it seems to me that makes it a more serious error if you're vouching for his credibility at great length. The defendant wants it to be about credibility. The government wants it to be about all of this other independent evidence, including the fact that he's caught with this money in Kansas and then shows up a week later. And the fact that while it's going on, the co-defendants are saying, you know, our guy is coming. And then when he comes, he does show up at this meeting, he's in a good mood, not only based on the undercover detective, but also another guy who's doing surveillance who says he walks out to the parking lot and is looking around. The type of thing that in a, you know, as I brought up, a car getting stopped at the border, things that are used as evidence of guilt all the time. Thank you. Thank you, counsel. Just briefly, I'd like to address the fact that this is really still just a credibility contest. And if you look at that stop in Kansas and then the second trip, if you recall the testimony at the trial was the only reason he made the second trip was because he didn't get paid for the first one and he only thought he was going to Kansas City. He didn't think he was driving all the way to Las Vegas to do another drug deal. The testimony of the Kansas City stop was when they found the money, he said he didn't know that it was there. The officers at the time believed him and they let him go. When he went to collect his money for driving that car, Camposano said, you've got to drive back to Kansas City and get me the money. I need you to sign some papers and then I'll pay you. So he drove to Kansas City to sign papers is what he thought. And then when he gets to Kansas City, Camposano says, well, now I'm in Vegas. You took too long. You've got to come to Vegas. So I don't think you can use the getting stopped with the money as independent evidence of his guilt. I think it still just comes down to a credibility contest. And that's what makes all the errors so egregious. And I think what you're pointing out that the recitation not only was it five or six pages regarding the truthfulness provision, but it occurred after he had completed his testimony for the government. So after he had said everything they wanted him to say, that's when they tell the jury, look, you had to be truthful. He says, we met, didn't we? And I told you if you lie, the deal is off. That makes the vouching even more egregious to put it in after he's given his testimony and essentially has a stamp of approval from the government that we've listened to him, we've agreed to give him the deal, and here's what he's done for us. He's told us the truth and we can tell you what the truth is because we know it. So unless there's any other questions, I'd submit it. Thank you, counsel. Thank you both very much. The argument was very helpful. Case disargued is submitted.
judges: Reinhardt, Noonan, Hawkins